Adam E. Polk (State Bar No. 273000)
Jordan Elias (State Bar No. 228731)
Kai W. Lucid (State Bar No. 327280)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
apolk@girardsharp.com
jelias@girardsharp.com
klucid@girardsharp.com

*Counsel for Plaintiffs*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| BLAKE MICHAEL WHITMORE, DANIEL RAPHAEL, MICHAEL DOMINGUEZ, and TOM LOCHTEFELD, on behalf of themselves and all others similarly situated, | Case No. 21-cv-3393 |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | DEMAND FOR JURY TRIAL |
| v. | |
| ZACHARY HORWITZ, 1INMM CAPITAL, LLC, and CITY NATIONAL BANK, | |
| Defendants. | |

Plaintiffs Blake Michael Whitmore, Daniel Raphael, Michael Dominguez, and Tom Lochtefeld, on behalf of themselves and all others similarly situated, allege as follows against Defendants Zachary A. Horwitz, 1inMM Capital, LLC, and City National Bank, based on personal knowledge as to themselves and their own acts, and otherwise based on the investigations conducted by and through their counsel, including review of Defendants' public statements, United States Securities and Exchange Commission filings, interviews, media reports, and social media information, as well as other commentary, analysis, and information.

## I.    SUMMARY OF THE ACTION

1.      1inMM, LLC, by and through its owner and operator, Zachary Horwitz, marketed and sold promissory notes as high-yield investments backed by purported content distribution contracts with Netflix and HBO. Unbeknownst to investors, those contracts never existed. 1inMM had no revenue, and no expectation of ever receiving revenue, at any time. Horwitz paid investor returns using new investor money, raising more than $690 million before his Ponzi scheme collapsed.

2.      Instead of acquiring and licensing movie rights, Horwitz diverted and misapplied investor funds—the "movements of funds [were] consistent with a Ponzi scheme," the Federal Bureau of Investigation concluded, as "incoming investor money was used to repay investors for previous investments. In some instances, the investors were repaid with their own money. In addition, funds were sent to the HORWITZ personal account." The FBI thus found that the frequent transfers that kept 1inMM afloat reflected "a Ponzi scheme rather than legitimate business along the lines of what HORWITZ described to his investors." The unlawful nature of Horwitz's enterprise was revealed on April 5, 2021, when the SEC filed a criminal complaint based on Horwitz's wrongful conduct. Horwitz now owes investors more than $230,000,000.

3.      A single Defendant bank received and processed the 1inMM investments. All of the accounts that held and transferred the money generated by Horwitz's fraud

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

were maintained at City National Bank, where Horwitz also had his personal bank account. 1inMM's banking activities were integral to his scheme to defraud investors. City National loaned Horwitz $1.4 million during 2019 and 2020 on a personal line of credit, and was on notice of Horwitz's fraud from a series of red flags associated with the accounts Horwitz was using to perpetrate the fraud. Drawing on 1inMM's accounts at City National, Horwitz spent millions of dollars on private plane travel, fancy cars, jewelry, and other luxury items. Although hundreds of millions of dollars flowed through the 1inMM enterprise, Horwitz remained the sole signatory on all of 1inMM's accounts. Further, 1inMM lacked internal controls and engaged in atypical banking activities. Horwitz pooled investment funds from holders of promissory notes in personal and entity accounts, commingling those funds between the accounts and using investor funds to pay purported returns to earlier investors. Despite the high volume of suspicious account activity—and the absence of any income consistent with 1inMM's stated business—there is no indication City National ever audited or questioned Horwitz about the 1inMM accounts. City National knew of and substantially assisted Horwitz's fraudulent scheme and is therefore jointly liable to the class of 1inMM investors.

## II.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiffs

4.   Plaintiff Blake Michael Whitmore is a citizen of California. Whitmore invested $200,000 in promissory notes issued by 1inMM through SAC Advisory, LLC.

5.   Plaintiff Daniel Raphael is a citizen of California. Raphael invested $100,000 in the 1inMM scheme by purchasing a $100,000 promissory note.

6.   Plaintiff Tom Lochtefeld is a citizen of Connecticut. Lochtefeld invested $150,000 in the 1inMM scheme by purchasing $150,000 worth of promissory notes.

7.   Plaintiff Michael Dominguez is a citizen of California. Dominguez invested $100,000 in promissory notes issued by 1inMM through SAC Advisory, LLC.

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

**B.      Defendants**

8.      Defendant Zachary Horwitz is a citizen of Los Angeles, California.

9.      Horwitz, an actor, founded 1inMM Capital, LLC in 2013 as a film distribution company.

10.      Defendant 1inMM Capital, LLC is a California limited liability company headquartered in Los Angeles. The address of 1inMM's headquarters is Horwitz's personal residence.

11.      All bank accounts associated with 1inMM were maintained at City National Bank. Horwitz was the sole signatory on each 1inMM account.

12.      Defendant City National Bank is a federally chartered bank with its principal place of business in Los Angeles. City National is a subsidiary of the Royal Bank of Canada, a foreign entity headquartered in Montreal, Quebec.

**C.      Relevant Non-Parties**

13.      Home Box Office, Inc. is an American entertainment company best known for its paid television channel HBO. Home Box Office, Inc. is a subsidiary of AT&T Inc., through Home Box Office, Inc.'s parent company Warner Media, LLC. AT&T, Inc. is a Delaware corporation headquartered in Dallas, Texas.

14.      Netflix, Inc., is an American entertainment company that runs a subscription-based video streaming service. Netflix is a Delaware corporation headquartered in Los Gatos, California.

15.      A number of entities were formed, or used, by persons persuaded by Horwitz to purchase 1inMM promissory notes. The following subparagraphs describe these "Feeder Funds":

a.      JJMT, LLC was a fund founded by Jacob Wunderlin, Mathew Schweinzger, and Joseph Dealteris for the purpose of supplying capital to 1inMM. JJMT agreed to loan Horwitz money in connection with Horwitz's scheme to deceive investors into investing in non-existent film distribution agreements. JJMT raised at least

3

$490,000,000 in investor funds that it paid Horwitz and 1inMM.

     b.    Pure Health Enterprises, Inc. was a fund that raised and supplied investor money to 1inMM. By the end of Horwitz's scheme, Pure Health had loaned 1inMM at least $20,400,000.

     c.    SAC Advisory, LLC ("SAC"), and its associated Fortune Film Fund One, LLC, and Fortune Film Fund Two, LLC, also raised and supplied investor money to 1inMM to fund its purported film licensing activities. By the end of Horwitz's scheme, SAC had loaned 1inMM at least $78,600,000.

     d.    Vausse Films was a fund that raised and supplied investor funds to 1inMM. By the end of Horwitz's scheme, Vausse had loaned 1inMM at least $21,000,000.

     e.    Movie Fund, LLC was another fund that raised and supplied investor money to 1inMM to fund its purported activities. By the end of Horwitz's scheme, Movie Fund, LLC had loaned 1inMM at least $80,000,000.

16.    Plaintiffs reserve their right to amend these allegations concerning Relevant Non-Parties.

## III.  JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction over all claims in this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because at least one member of the plaintiff class is a citizen of a different state than at least one Defendant, the total amount in controversy exceeds $5 million, excluding interest and costs, and the class contains more than 100 members.

18.    Venue is proper in this District under 28 U.S.C. § 1391 because Defendants Zachary Horwitz and 1inMM transacted business in and maintained their principal place of business in this district.

19.    The Court has personal jurisdiction over Defendants because, among other things, each Defendant, directly or through its agents and affiliates, sold the subject

investments throughout the United States, including in this judicial district, and has sufficient contacts with this district to make the Court's exercise of personal jurisdiction proper and necessary. Horwitz resides in this district, 1inMM maintained its principal office here, and the underlying scheme to defraud emanated from the Los Angeles area.

## IV.    OVERVIEW OF RELEVANT BANKING REGULATIONS

20.    Federal law requires banks to know their customers and understand their customers' banking behavior. Under applicable regulations, a bank must maintain procedures that allow it to "form a reasonable belief that it knows the true identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2). Thus, banks are required to collect information about the holder of each account. Where an entity opens an account, the bank must obtain information concerning the individuals who control the account.

21.    City National is obligated to comply with the Bank Secrecy Act (BSA), 12 C.F.R. § 21.21, including regulations broadening its anti-money laundering provisions.

22.    The BSA requires City National to develop, administer, and maintain a program to ensure compliance. The program must be approved by the bank's board of directors and noted in the board meeting minutes. It must: (1) provide for a system of internal controls to ensure ongoing BSA compliance, (2) provide for independent testing of the bank's compliance, (3) designate an individual to coordinate and monitor compliance, and (4) provide training for appropriate personnel.

23.    City National also must develop a customer due diligence program to assist in predicting the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, thereby providing the bank with a means for identifying unusual or suspicious transactions for each customer. The customer due diligence program allows the bank to maintain awareness of the financial activity of its customers and the ability to predict the type and frequency of transactions in which its customers are likely to engage.

24.    Customer due diligence programs should be tailored to the risk presented by

individual customers, such that the higher the risk presented, the more attention is paid. Where a customer is determined to be high risk, banks should gather additional information about the customer and accounts, including determining: (1) purpose of the account; (2) source of funds; (3) proximity of customer's residence to the bank; and (4) explanations for changes in account activity.

25.     Additionally, City National must designate a BSA compliance officer who is a senior bank official responsible for coordinating and monitoring compliance with the BSA. The compliance officer must, in turn, designate an individual at each office or branch to monitor the bank's day-to-day BSA compliance.

26.     The federal government established the Federal Financial Institutions Council ("FFIEC") in 1979 to prescribe uniform principles, standards, and report forms and to promote uniformity in the supervision of financial institutions. The FFIEC's Bank Secrecy Anti-Money Laundering Manual summarizes BSA and anti-money laundering compliance program requirements, risks and risk management expectations, industry sound practices, and examination procedures. The FFIEC manual is based on BSA laws and regulations and BSA and anti-money laundering directives issued by federal banking agencies, such as the Federal Reserve, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of Currency. *See* FFIEC BSA/AML Examination Manual, at p. 1 (2014).

27.     Banks must also ensure that their employees follow BSA guidelines. Banks make compliance a condition of employment and incorporate compliance with the BSA and its implementing regulations into job descriptions and performance evaluations. Banks are therefore required to train all personnel whose duties may require knowledge of the BSA on that statute's requirements.

28.     Banks and their personnel must be able to identify and take appropriate action once put on notice of any of a series of money laundering "red flags" set forth in the FFIEC BSA/AML Examination Manual. These red flags include: (1) repetitive or

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

unusual fund transfer activity; (2) fund transfers sent or received from the same person to or from different accounts; (3) transactions inconsistent with the account holder's business; (4) transfers of funds among related accounts; (5) depositing of funds into several accounts that are later consolidated into a single master account; (6) large fund transfers sent in round dollar amounts; (7) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; (8) multiple high-value payments or transfers between shell companies without a legitimate business purpose; (9) payments unconnected to legitimate contracts or revenue sources; (10) fund transfers containing limited content or related party information; (11) transacting businesses sharing the same address; and (12) an unusually large number of persons or entities receiving fund transfers from one company.

29.     The FFIEC Manual identifies "lending activities" and "nondeposit account services"—including nondeposit investment products—as services requiring enhanced due diligence and carrying a high risk of money laundering because they facilitate a higher degree of anonymity and involve high volumes of currency. Thus, the FFIEC Manual requires heightened due diligence on the part of banks when such services occur, including determining the purpose of the account, ascertaining the source and funds of wealth, identifying account control persons and signatories, scrutinizing the account holders' business operations, and obtaining explanations for account activity.

## V.     FACTUAL ALLEGATIONS

### A.     Horwitz and 1inMM Committed Investment Fraud Based on a Fictitious Film-Rights Licensing Enterprise.

30.     Zach Horwitz, better known by the screen name Zach Avery, is a 34-year-old actor. In 2013, Horwitz started a putative film distribution company called 1inMM Capital, LLC. Horwitz soon began soliciting investors to put money into his company. Among the first individuals Horwitz contacted were three of his friends from college, Jacob Wunderlin, Joseph Dealteris, and Mathew Schweinzger. These three individuals

7

purchased their first 1inMM promissory notes in or about March 2014. Horwitz continued to solicit investments from the three, and they formed JJMT to facilitate their investing in 1inMM. By raising funds from their friends and families, the principals of JJMT ultimately provided the majority of 1inMM's funding.

31.     From 2013 to February 2021, 1inMM raised money by issuing promissory notes. Investors purchased these notes on the premise that they secured an interest in film licensing agreements between 1inMM and reputable film companies like Netflix or HBO. The relevant promissory notes typically had a term of 6-12 months and were marketed as paying between 15-40% annual returns on principal upon maturation of the note.

32.     Horwitz represented to investors that through 1inMM (and his purported Hollywood insider status) he was able to purchase the distribution rights to certain films, which he would then license for distribution on HBO and Netflix in Latin American markets. Horwitz represented to investors that his industry connections gave him the ability to license the film distribution rights to HBO and Netflix at a higher price than what he had paid for the rights, and that 1inMM derived its income from the profits from such sales of rights. But in fact, Horwitz transferred investor funds between his various City National accounts to create the illusion that 1inMM was paying out on the promissory notes, using funds from later investments to pay returns on notes purchased earlier.

33.     In July 2015, Horwitz sent investors hard copies of a purported "Annual Report" produced by 1inMM. The report states that in 2015 1inMM had "continue[d] to source quality feature film projects," and "expanded [its] business model with HBO Entertainment and Netflix to not only service the thriving Latin-American marketplace but" also to "distribut[e] feature films to Australia and New Zealand as well."

34.     This Annual Report document shows thumbnail-sized movie covers for 52 films, and contains a section entitled "Our Strategic Partnerships" that depicts the logos

of such companies as HBO, Netflix, Sony, and City National Bank.

35.     1inMM claimed that its "strategy has been and will always be a collateralized investment approach to ensure that solid returns and safe investments are the pillars that solidify our foundation." The Annual Report document further states that "[i]f, at any point, one of our current output deals" with HBO, Sony, or Netflix "default[s] on a payment owed to the company," 1inMM would retain its license to the film and hence would still be able to license it to another distribution company. These statements were false.

36.     Horwitz also falsified emails. A Netflix content executive averred that it became known to Netflix that 1inMM was using forged documents and communications to falsely represent it had entered into licensing agreements with Netflix.

37.     Horwitz raised money from investors who purchased the promissory notes described above. Horwitz claimed that each note corresponded to the purchase of distribution rights to a specific film. For example:

       a.     On December 17, 2018, Horwitz signed a promissory note by which 1inMM borrowed $1,425,500 from investors and obligated itself to repay $1,998,825 within 12 months for a return on investment of approximately 40 percent. This note was purportedly related to a deal for distribution rights to a film called "Active Measures."

       b.     On September 27, 2019, Horwitz signed a promissory note by which 1inMM borrowed $742,250 from investors and obligated itself to repay $999,845 within six months for a return on investment of approximately 35 percent. This note was purportedly related to a deal for distribution rights to a film called "Bitter Harvest."

38.     Horwitz also provided investors with forged documents purporting to show that Horwitz and 1inMM had legitimate film-licensing deals with online platforms. For example:

       a.     Horwitz provided JJMT with a 12-page license agreement dated October 2, 2019, purportedly between 1inMM and Sierra/Affinity (as agent for Meyer

9

Media Group), granting 1inMM exclusive rights to distribute "Bitter Harvest" in Latin America for $739,500.

      b.    Horwitz provided JJMT with a 13-page distribution agreement dated September 11, 2019, purportedly between 1inMM and HBO, granting HBO rights to distribute the film "Bitter Harvest" in Africa and Latin America for a term of three years for $999,845.

      c.    Horwitz provided JJMT with a 12-page license agreement dated December 17, 2018, purportedly between 1inMM and Sierra/Affinity (as agent for Shooting Films), granting 1inMM exclusive rights to distribute the film "Active Measures" in certain foreign countries for a term of 15 years for $1,425,500.

39.    A member of HBO's legal department attested that HBO had obtained licenses to the films listed in 1inMM's promotional materials from studios unaffiliated with Horwitz like Lionsgate or Sony.

**B.    The Investor Fraud Was Made Possible by 1inMM's Accounts and Banking Activities at City National.**

40.    1inMM raised more than $690,000,000 from investors nationwide. Many of these individuals invested their retirement funds in the scheme. 1inMM now owes its investors more than $234,700,000, and is in default to investors as follows:

      a.    $165,000,000 owed to JJMT;

      b.    $22,000,000 owed to Movie Fund;

      c.    $29,700,00 owed to SAC;

      d.    $8,000,000 owed to Vausse Films; and

      e.    $10,000,000 owed to Pure Health.

41.    Horwitz was the sole signatory on all of 1inMM's company bank accounts: "1inMM Business Account," "1inMM Business Account #2," and "1inMM Productions Account" (the "1inMM Accounts"). Horwitz was the sole owner, and maintained sole operational control over, 1inMM and each of its related entities. Horwitz maintained his

personal bank account at City National, along with the 1inMM Accounts, and transferred money directly between the 1inMM Accounts and his personal account.

42.     After conducting a forensic analysis of 1inMM Business Account and 1inMM Business Account #2, the SEC determined that "disbursements made to investors" out of these company accounts were "Ponzi payments based on the fact that all the money in the bank account at the time the payments were made consisted of investor funds." The SEC found that a sample of the fraudulent payments made from 1inMM Business Account totaled nearly $2,500,000 in March 2017, more than $3,000,000 in November 2018, and over $3,500,000 in June 2019. Every penny of these payments was investor money.

43.     On March 26, 2018, Horwitz's personal account at City National had a balance of approximately $100,000. The next day, $2,225,564 of investor money was deposited into the account. The day after that, Horwitz transferred more than $3,000,000 from the 1inMM Accounts to his personal account and, using the investor funds, purchased a private home for $5,556,401 near Beverly Hills.

44.     Horwitz also used investor funds in the City National accounts to pay for personal luxuries and extravagant trips. In 2018, Horwitz used money invested by class members to pay for the following personal expenses, among others: (1) satisfying personal credit-card debt of $1,842,840; (2) chartering private planes at a cost of $137,072; and (3) paying at least $691,800 for luxury automobiles. In 2016 and 2017 Horwitz spent at least $124,582 in investor money on trips to Las Vegas. As part of those trips Horwitz paid approximately $58,000 to "Red Carpet VIP," a travel company whose website shows young women in bikinis.

45.     Furthermore, Horwitz repeatedly commingled investor and personal funds. On one occasion, a 1inMM Account received $23,756 from another Horwitz account (which the SEC termed the "Rogue Black" account), and the 1inMM Account then transferred $23,756 to Horwitz's personal account. On another occasion, Horwitz's

11

personal account received $30,000 from a source labeled "Tr Invst A/C," $23,756 from 1inMM Business Account #2, and $18,000 from another of Horwitz's accounts—after which Horwitz's personal account disbursed $33,762 in credit-card payments, $18,769 toward a mortgage, and $11,980 into another 1inMM Account.

46.     As of April 1, 2021, the 1inMM Accounts held only around $1.15 million, a shortfall of over $200 million from the investor funds that had been raised.

### C.     City National Bank Materially Aided the Investment Fraud.

47.     Horwitz's banking activities were integral to his scheme to defraud investors. Horwitz could not have carried out his scheme without a compliant financial institution willing to look the other way when confronted with suspect account activity.

48.     Horwitz maintained at least seven different bank accounts at City National for which he was the sole authorized signatory. Horwitz also maintained a personal bank account at City National, as well as a City National bank account for the MJLZ Trust (a Horwitz-created trust that, as late as April 2021, held title to a $5.5 million dollar home in Los Angeles). City National also provided Horwitz with a personal credit line in excess of $1.1 million.

49.     As set forth above, federal law requires banks to know their customers and understand their customers' banking behavior. When an entity opens an account, the bank must obtain information concerning the individuals who control the account as well as the nature of the entity's business. To these ends, when establishing a bank account for an entity, banks classify the entity in accordance with the North American Industry Classification System—i.e., banks assign the entity a "NAICS Code."

50.     City National applied the NAICS designation for "film finance" to the two primary business accounts through which Horwitz perpetrated his scheme. Despite City National's recognition that Horwitz's supposed business model related to film finance, the only business model consistent with Horwitz's banking practices was the operation of a Ponzi scheme.

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

51.     Had 1inMM been a legitimate film financing business, City National would have processed and seen debits from the accounts to purchase film distribution rights. And it would have processed and seen credits from film distributors like HBO and Netflix for the purchase of those rights. Instead, once investor funds were deposited into the business accounts controlled by Horwitz, the funds received were used to repay Horwitz's earlier investors, in Ponzi-like fashion. Millions of dollars also were diverted into Horwitz's personal account at City National, and used to purchase Horwitz's multi-million-dollar home, pay off his credit card balances and fund a lavish lifestyle.

52.     Horwitz treated his accounts at City National as "pass-through" accounts, a recognized marker of Ponzi-style fraud or money laundering. In December 2018, the 1inMM capital account started with a balance of more than $4.3 million. Over the course of the month, it received more than $16.3 million in deposits comprised of investor funds. More than $18.4 million in wires left the account, round-tripping back to investors. And more than $680,000 in transfers were made to *other* Horwitz-related accounts, including $500,000 to Horwitz's personal account. The 1inMM capital account ledger reflected no payments consistent with the purchase or sale of movie distribution rights. There were no payments to sales agents or film production companies. Further, no money came in from HBO, Sony, Netflix or any other online entertainment platform. At month's end, the account balance was just over $1.4 million.

53.     In addition, transfers between Horwitz's accounts were almost always in round dollar amounts even when millions of dollars were being moved around. Round number transfers, another hallmark of financial fraud, are a "red flag" cited in the FFIEC BSA/AML Examination Manual referenced above.

54.     The account activities in which Horwitz was engaging reflected characteristic indicia of a Ponzi scheme and no indication of a legitimate investment business. Yet City National processed all of Horwitz's suspicious transfers even though it had sophisticated artificial intelligence systems for detecting money laundering and

13

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

other suspicious account activity. City National never took any steps to close Horwitz's accounts.

55.     In March 2019, despite the commingling, pass-through activity, round dollar transfers, and declining funds in the other Horwitz-related accounts, City National's "Entertainment Premier" division underwrote and extended Horwitz a personal line of credit for $1.14 million (activity triggering enhanced due diligence obligations under the FFIEC Manual). Even with 1inMM's account balances dwindling, City National decided to fund this line of credit to retain Horwitz as a customer. It even allowed Horwitz to put up as collateral a securities account controlled at least partly by his mother. Horwitz used the money from the City National line of credit to keep his 1inMM scheme going.

56.     1inMM also touted its relationship with City National in investor marketing materials and in legal documents it circulated to investors, lending an air of legitimacy to its business.

**D.     The Fraud Is Revealed**

57.     Horwitz and 1inMM paid investors their promised returns until December 2019, when Horwitz and 1inMM began defaulting on their promissory notes with JJMT.

58.     Horwitz attempted to conceal the impending defaults by maintaining that HBO and Netflix were refusing to provide agreed-upon payments. Horwitz forged emails purporting to show employees at Netflix and HBO communicating with 1inMM about its licensing agreements. He then provided these phony emails to investors in an effort to placate them.

59.     On February 13, 2020, Horwitz emailed the JJMT principals, passing on forged correspondence between him and a "Senior Counsel" at Netflix. In the forwarded email, the senior counsel wrote that Netflix was performing an audit to confirm "that all materials are in place, rights are cleared, paperwork is in order, etc." Horwitz forwarded multiple similar emails to JJMT over the next few months.

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

60.     In March 2020, Horwitz informed investors that Netflix was performing an audit on the films he had licensed it. Horwitz claimed the reason for this audit was to ensure the films had "clear title," and that Netflix would pay 1inMM the licensing fees when it completed the audit.

61.     As for HBO Latin America, Horwitz claimed that division was restructuring, which would require it to change its operating practices. Horwitz again forwarded multiple fabricated emails to JJMT purporting to show employees at HBO discussing this restructuring with Horwitz.

62.     Law firm K&L Gates provided legal counsel to Horwitz. With his fraudulent scheme beginning to unravel and promissory debts overdue, a New York-based K&L Gates attorney wrote a letter dated October 30, 2020 to investors assuring them that payments were coming soon. Horwitz's K&L Gates lawyer informed the investors that 1inMM's default resulted from HBO's failure to pay 1inMM for content that 1inMM had licensed to HBO. He wrote that 1inMM was negotiating with HBO and expected payment within month. The attorney designated his letter "STRICTLY CONFIDENTIAL," warning the investors that any disclosures about 1inMM's dealings with HBO might jeopardize any deal and dash their hopes of repayment.

**E.     The SEC's Enforcement Action**

63.     On April 5, 2021, the SEC filed a criminal complaint against Horwitz and 1inMM in this district. The complaint alleges that Horwitz ran a Ponzi scheme.

64.     That same day Horwitz was arrested at his home in Los Angeles, and he remains in custody.

## VI.     AGENCY AND ALTER EGO ALLEGATIONS

65.     At all relevant times, Defendants and each Relevant Non-Party was a principal, agent, alter ego, joint venturer, partner, or affiliate of Defendants and each of the other Relevant Non-Parties, and in doing the acts alleged herein, was acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or

15

affiliate relationship. Defendants and each Relevant Non-Party had actual knowledge of the wrongful acts of Defendants and each of the other Relevant Non-Parties; ratified, approved, joined in, acquiesced, or authorized the wrongful acts of Defendants and each of the other Relevant Non-Parties; and retained the benefits of those wrongful acts.

66.     Defendants and each Relevant Non-Party aided and abetted, encouraged, and rendered substantial assistance to Defendants and each of the other Relevant Non-Parties in perpetrating their fraudulent scheme on Plaintiffs and the class. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Defendants and each Relevant Non-Party acted with an awareness of its primary wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

## VII.  TOLLING OF THE STATUTES OF LIMITATIONS

67.     Horwitz and 1inMM, aware of the illegal scheme and its injurious effects, fraudulently concealed the scheme by failing to report it while continuing to solicit new investors. Horwitz and 1inMM fraudulently concealed from Plaintiffs that the promissory note offered by 1inMM were fabricated, and that, in fact, 1inMM and Horwitz had never had any business relations with Netflix, Sony or HBO; that rather than profiting from selling film rights at an increased price, Horwitz and 1inMM were embezzling millions of dollars in investor funds for his own personal use and enjoyment; and that Horwitz and 1inMM had never entered into any agreements whatsoever with its purported strategic partners.

68.     Horwitz and 1inMM were aware that Plaintiffs did not know about the licensing fraud. Horwitz and 1inMM had superior and exclusive knowledge of that fraud. Despite reasonable diligence on their part, Plaintiffs and class members were kept ignorant by Horwitz and 1inMM of the factual bases for these claims for relief.

69.     Horwitz and 1inMM caused to be distributed materials containing material

misstatements and omissions designed to entice Plaintiffs to purchase supposedly safe investments with high returns generated by Horwitz's and 1inMM's contacts in film production. These fraudulent misrepresentations had the effect of concealing that Horwitz was, in fact, using new investor funds to pay existing investors' supposed returns.

70.     Plaintiffs reasonably relied to their detriment on Horwitz's and 1inMM's fraudulent concealment of their violations. As a result of this concealment, Plaintiffs and class members did not believe that it was necessary to file a lawsuit.

71.     Plaintiffs did not discover, and exercising reasonable diligence could not have discovered, the facts establishing Horwitz's and 1inMM violations or the harm caused thereby until the FBI arrested Zachary Horwitz in April 2021. Plaintiffs learned of the relevant actions of Horwitz and 1inMM through the SEC actions and their coverage in the press. Because Plaintiffs could not have reasonably discovered the facts constituting Defendants' violations until April 2021, all applicable statutes of limitation were tolled until then.

## VIII.  CLASS ACTION ALLEGATIONS

72.     Plaintiffs bring this suit as a class action on behalf of themselves and all other persons similarly situated, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), on behalf of a class of all persons who directly, or indirectly, invested in 1inMM promissory notes.

73.      Excluded from the class are Defendants, their parents, affiliates, subsidiaries, agents, legal representatives, predecessors, successors, assigns, employees, any entity in which Defendants has a controlling interest or which has a controlling interest in Defendants, and the Relevant Non-Parties listed above.

74.     Numerosity. The class members are too numerous to be practicably joined. The class members are identifiable from information and records in the possession, custody, or control of Defendants or the Relevant Non-Parties. Notice of this action can

17

be provided to all members of the class, and the disposition of their claims in a single action will provide substantial benefits to all parties and the Court.

75.     Typicality. Plaintiffs' claims are typical of the claims of other members of the class. Plaintiffs and each class member invested either directly, through solicitations by Defendants, or indirectly via solicitations from a Feeder Fund or other entity, in the 1inMM licensing scheme and were thus subject to the wrongful conduct alleged herein.

76.     Adequacy of Representation. Plaintiffs are members of the class and will fairly and adequately represent and protect its interests. Plaintiffs have no interests contrary to or in conflict with the interests of the other class members.

77.     Plaintiffs' counsel are competent and experienced in class action and investor fraud litigation and will pursue this action vigorously.

78.     Commonality and Predominance. Common questions of fact and law exist as to all members of the class and predominate over any questions pertaining to individual class members. The questions common to the class include:

       a.      Whether Horwitz and 1inMM committed fraud;

       b.      Whether Horwitz and 1inMM breached duties to Plaintiffs and members of the class;

       c.      Whether City National aided and abetted such violations; and

       d.      Whether, in view of their investment losses, Plaintiffs and class members are entitled to damages.

79.     Superiority. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Absent a class action, most members of the class would find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment will conserve judicial resources, avoid the risk of inconsistent rulings, and promote efficiency of adjudication.

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

## IX.   CLAIMS FOR RELIEF

### COUNT 1

### Fraud by Omission

### (Against Horwitz and 1inMM)

80.   Plaintiffs hereby incorporate all the foregoing allegations by reference.

81.   As set forth more fully above, Horwitz and 1inMM perpetrated fraud on the investing public through a series of materially false and misleading statements and omissions in promoting these investments. Among other fraudulent conduct, Horwitz and 1inMM:

a.   Misrepresented that film licensing and distribution agreements secured the promissory notes being sold;

b.   Misrepresented that the licensing and distribution agreements were made possible by Horwitz's relationship with major studios such as Netflix and HBO;

c.   Misrepresented that the investment funds would be applied to obtain the rights to films;

d.   Concealed from investors that Horwitz and 1inMM were operating a Ponzi scheme by, among other unlawful acts, commingling investor funds and paying earlier investors with funds obtained from later investors; and

e.   Concealed from investors that Horwitz was misappropriating and misusing millions of dollars in investor funds for improper purposes.

82.   Plaintiffs and class members reasonably relied to their detriment on Horwitz's and 1inMM's fraudulent representations and omissions when they made the relevant investments.

83.   As a direct and proximate result of Horwitz's and 1inMM's fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393

## COUNT 2

### Aiding and Abetting Fraud

### (Against City National)

84.     Plaintiffs hereby incorporate all the foregoing allegations by reference.

85.     City National knowingly and substantially assisted Horwitz and 1inMM in defrauding Plaintiffs and the class, in at least the following respects:

      a.     Accepting for deposit funds derived from the sale of unregistered securities;

      b.     Commingling funds from 1inMM promissory note holders and Horwitz's personal monies;

      c.     Executing and condoning atypical banking procedures to service Horwitz's complex series of accounts;

      d.     Carrying out improper and highly suspicious financial transactions such as the unexplained transfers between 1inMM's business accounts and Horwitz's personal accounts;

      e.     Accommodating the fact that Horwitz was the only signatory on any of the multi-million-dollar 1inMM accounts;

      f.     Failing to exercise due diligence related to the regulatory and compliance "red flags" discussed above when servicing the 1inMM accounts;

      g.     Extending a personal line of credit to Horwitz while the other Horwitz-related accounts showed Ponzi-like activity and dwindling balances;

      h.     Failing to implement and adhere to compliance and monitoring protocols concerning the use of Plaintiffs' and class members' investment funds; and

      i.     Failing to prevent, report, or otherwise take corrective action in response to Horwitz's diversion and misuse of investor funds.

86.     In connection with providing substantial and material assistance to Horwitz and 1inMM, City National was aware of its role in Horwitz's Ponzi scheme and acted

knowingly in assisting Horwitz and 1inMM.

87.   City National substantially benefited from its participation in Horwitz's Ponzi scheme. The scheme caused City National to earn income from fees and from investing capital derived from 1inMM investors.

88.   As a direct and proximate result of City National's aiding and abetting of fraud, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 3

### Breach of Fiduciary Duty

### (Against Horwitz)

89.   Plaintiffs hereby incorporate all the foregoing allegations by reference.

90.   At all relevant times, Horwitz was the managing director of 1inMM Capital, LLC and maintained complete or substantially complete control over 1inMM. Horwitz also had complete control over, and was the sole signatory for, the City National Bank accounts in which investor funds were deposited. Horwitz personally communicated with investors as well.

91.   At all relevant times, the Feeder Funds were Horwitz's agents in that they had actual authority to act on Horwitz's behalf in soliciting investors, Horwitz manifested his assent for them to so act, and they operated under Horwitz's control with regard to the marketing and sale of the promissory note investments.

92.   By reason of his controlling positions, actions, and direct and indirect representations to Plaintiffs, Horwitz owed them fiduciary duties of loyalty, care, and to deal honestly and in good faith. By selling Plaintiffs promissory notes pursuant to false offering materials, and by misappropriating, commingling, and otherwise misusing investor funds, Horwitz breached fiduciary duties he owed to Plaintiffs.

93.   As a direct and proximate result of Horwitz's breaches, Plaintiffs and class members have been damaged in an amount to be determined at trial.

## COUNT 4

### Aiding and Abetting Breach of Fiduciary Duty

### (Against City National)

94.     Plaintiffs hereby incorporate all the foregoing allegations by reference.

95.     City National substantially assisted in Horwitz's breaches of fiduciary duty with knowledge that Horwitz was breaching those duties, and, as a direct and proximate result of City National's aiding and abetting violations, Plaintiffs have been damaged in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment:

A.     Certifying this action for class treatment, appointing Plaintiffs as class representatives, and appointing Plaintiffs' counsel as class counsel;

B.     Awarding damages, including pre-judgment interest, on each Count in an amount to be determined at trial;

C.     Awarding reasonable attorneys' fees and costs of litigation; and,

D.     Granting such other relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs respectfully request a jury trial on their claims.

Respectfully submitted,

Dated: April 20, 2021                    By:  /s/ *Adam E. Polk*

Adam E. Polk (State Bar No. 273000)
Jordan Elias (State Bar No. 228731)
Kai W. Lucid (State Bar No. 327280)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, California 94108
Tel: (415) 981-4800

22

apolk@girardsharp.com
jelias@girardsharp.com
klucid@girardsharp.com

**LEVINE KELLOGG LEHMAN
  SCHNEIDER & GROSSMAN LLP**
Jason Kellogg (*pro hac vice* forthcoming)
Victoria J. Wilson (*pro hac vice*
 forthcoming)
201 South Biscayne Boulevard
22nd Floor, Miami Center
Miami, Florida 33131
Telephone: 305.403.8788
jk@lklsg.com
vjw@lklsg.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT
CASE NO. 21-cv-3393